FEDERAL DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMY RAE, | ) |
| | ) |
| PLAINTIFF | ) |
| | ) |
| v. | )    Case No. |
| | ) |
| WOBURN PUBLIC SCHOOLS, | ) |
| | ) |
| CITY OF WOBURN, | ) |
| | ) |
| MATTHEW CROWLEY, | ) |
| Individually, and | ) |
| | ) |
| CARL NELSON, | ) |
| Individually | ) |
| | ) |
| DEFENDANTS | ) |

--------------------------------------------------------

## **COMPLAINT AND JURY DEMAND**

1.    Plaintiff is an individual who resides in Winchester, Middlesex County, Massachusetts.

2.    Defendant the Woburn Public Schools ("District") is a school district in Woburn, Massachusetts that receives federal financial assistance.

3.    Defendant City of Woburn (the "City") is a municipality that receives federal financial assistance with regard to education of the students at the Woburn Public Schools.  Ms. Rae's teacher contracts were issued by the City of Woburn.

4.    Defendant Matthew Crowley is an individual who works at 55 Locust Street, Woburn, Massachusetts and upon information and belief resides in Lexington, Massachusetts. He is the

Superintendent of Woburn Public Schools. He knew of the retaliation and harassment against Plaintiff and did nothing to correct it and even made it worse by conducting sham investigations.

5.      Defendant Carl Nelson is an individual residing in Tewksbury, Massachusetts and is the Principal of the Kennedy Middle School, where Plaintiff works, and has engaged in a pattern of severe and persistent harassment of and retaliation against Plaintiff.

## JURISDICTION AND VENUE

6.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. This Honorable Court is the appropriate venue because all parties live and work, and all of the actions have taken place, in the Commonwealth of Massachusetts.

## INTRODUCTION

7.      This is a complaint for discrimination and retaliation against a nurse at the Woburn Public Schools.

8.      The Plaintiff has been the subject of an ongoing campaign of bullying, harassment, intimidation and retaliation because she advocated for disabled students with special education needs and because she spoke out about major deficiencies in the special education program.

9.      The actions of the Woburn Public Schools constitute violations of the Americans With Disabilities Act, Section 504 of the Rehabilitation Act and M.G.L. c. 151B.

10.     The main aggressor was Defendant Carl Nelson who has a disdain for students with disabilities whom he considers weak and not deserving of special attention or funding. He has acted with full knowledge of the administration who has ratified and encouraged his behavior. Meanwhile, the Plaintiff has sought several avenues of relief to no avail, all the while experiencing extreme emotional distress while she attempted to make the district follow the law and provide the federally-mandated services to these students.

## FACTS

11.    Plaintiff Amy Rae has been a nurse with the Woburn Public Schools since 2005. She is well-liked by the students and their families and fellow teachers for the concern she displays during her work. She has at all times met or exceeded the professional standards.

12.    In October of 2011, the Massachusetts DESE Executive Office of Health and Human Services sent a letter to all school districts in Massachusetts which published guidelines for schools to handle students with diabetes and encouraged all schools to create policies in accordance with the guidelines. Ms. Rae realized that Woburn Public Schools lacked a comprehensive policy and began advocating for a diabetes policy to be implemented. Defendant Nelson began to intimidate her, insisting students with disabilities "should not be treated any differently than other students" and should not receive accommodations or services related to their conditions.

13.    Defendant Nelson often referred to diabetic students as "lazy" and complained that they used their medical condition as an excuse to get out of work. He often refused to students' Section 504 plan, which denied students of needed services.

14.    Ms. Rae was concerned that students' needs were not being fulfilled, in violation of federal law, and she began speaking out to members of the administration.

15.    Defendant Nelson started harassing Plaintiff in an attempt to discourage her advocacy. He would stand over Ms. Rae as she sat at her desk and would yell and demean her, in an effort to silence her from discussing the inadequacies of the administration.

16.    As an example of Defendant Nelson's disdain for children with medical issues, once when Ms. Rae asked Defendant Nelson about her annual staff training on epipen administration and diabetes management, he had an explosive reaction to this request, yelling and berating her.

Nurse Rae had been conducting these trainings, with standing permission, since 2009. However, Defendant Nelson tried to intimidate her into discontinuing these necessary trainings.

17.    One special education teacher confided in Nurse Rae that she should beware because Principal Nelson "has it sort of… in for you." Nurse Rae heard a similar comment from union grievance officer, Brian Gilbertie and the music teacher. Defendant Nelson's actions confirm that he indeed "has it in for" Ms. Rae.

## FIRST UNFOUNDED DISCIPLINARY ACTION

18.    In 2011, Woburn had an unusually large number of students with diabetes but had no official diabetes policy. Ms. Rae reached out to Nurse Leader Marcia Skeffington for help to be hired, but her requests fell on deaf ears. Instead of working to rectify the situation, Ms. Skeffington mocked Ms. Rae and scolded her for "rocking the boat" by asking for more money. Ms. Skeffington's behavior was known and ratified by the district's administration, including Defendant Crowley and Defendant Nelson.

19.    Defendant Nelson conspired with Ms. Skeffington and the two engaged in a coordinated effort to harass Ms. Rae.

20.    Ms. Skeffington told Mr. Nelson that Ms. Rae had erred in one of the reports Ms. Rae had prepared. Ms. Skeffington knew that it was only a scrivener's error. However, based on her word, Mr. Nelson disciplined Ms. Rae for the error. This punishment was disproportional and not warranted.

21.    In December of 2011, Ms. Rae reached out to the union president to file a grievance about the unfounded discipline. The union attempted to resolve the issues to no avail.

22.     The bullying continued, so on March 17, 2012, Ms. Rae reached out to Superintendent

Mark Donovan for help. He sided against the disciplinary action. However, bullying continued

on many fronts.

23.     In May of 2012, the president of the union drafted a proposed agreement to be signed

between Ms. Rae and the administration to put an end to the bullying, stating that this was the

typical resolution to a harassment suit and was an effort to avoid litigation. However,

Superintendent Donovan never executed the agreement.

24.     Ms. Rae hired an attorney who in August of 2012, began corresponding with the district

to seek a resolution. Superintendent Mark Donovan kept putting off the attorney and made

promises that were never fulfilled.

25.     Meanwhile, Ms. Skeffington and Mr. Nelson continued to harass and berate Ms. Rae.

## MISHANDLING OF DIABETIC STUDENT BY DEFENDANT NELSON RESULTS IN HARM TO MS. RAE

26.     Between November and December of 2012, a problem arose with a diabetic student who

was refusing to cooperate in self-care. Ms. Rae tried to help this student but was thwarted by

Defendant Nelson. Instead of allowing Ms. Rae to handle the medical situation, Defendant

Nelson retaliated against the student by filing a complaint against the student's family with the

Department of Child Welfare, making the situation worse.

27.     This made the parents of the student angry. The parents mistakenly thought Ms. Rae was

the person who filed the complaint and they began verbally attacking her. Defendant Nelson

never came to Ms. Rae's defense or took responsibility for his actions. This caused Ms. Rae

extreme distress as she was being used as a "fall guy" for the district's misdeeds.

28.     Ms. Rae went back to her attorney but was so distraught and feared further retaliation,

that she had the attorney hold off from taking more action.

29.    However, the bullying got worse, so in February of 2013, Ms. Rae's lawyer began communicating again with the district. Unfortunately, after months of correspondence, no solution was reached.

## MS. RAE'S EFFORTS TO HELP DIABETIC STUDENT THWARTED AND USED AGAINST HER

30.    On or about February 2013, a diabetic student was having trouble managing his condition. Defendant Nelson made the student sit in the guidance office unsupervised for four weeks as the district decided about a new placement for the student. The guidance office was often used for the purpose of having the students fulfill their in-house suspensions.

31.    Ms. Rae was concerned that the student's rights were being violated, because he was refused tutoring, and therefore he was not receiving an appropriate education, so she contacted the chair of the Special Education department to report what was going on and to try to get the student more services. This angered Defendant Nelson even more and his harassment intensified.

32.    Defendant Nelson insisted that the student have a special education paraprofessional escort every time he needed to go to the nurse's office. The paraprofessionals resented having to take time away from their duties and took their frustration out on Ms. Rae, and harassed Ms. Rae in their frustration over Defendant Nelson's policy.  They would yell at Ms. Rae when they came to the office and complain that Ms. Rae was causing them to miss their lunch time. Defendant Nelson never stepped in to stop the harassment, and the student was caught in the middle.

## MS. RAE FILES REPORT WITH MASS DPH

33.    Ms. Rae reached out to Mass Department of Public Health Director of School Health Services Ann Sheetz for help. She reported to the Department of Public Health how Defendant Nelson had been refusing to add additional medical related services for diabetic students whose

management was out of control.  This was directly related to Defendant Nelson's refusal to push for a new diabetes policy.

34.    Ann Sheetz told Ms. Rae that Woburn was failing in its standard of care for students with advanced medical needs, adding a part-time nurse under Nurse Rae, diverting time away from the other students who needed servicess Defendant Nelson refused to add these additional services to his budget.

35.    Following the advice from Ann Sheetz, Nurse Rae sent a formal request to the administration for additional nursing hours to be assigned to assist her with the care, education, and medical tasks needed for the students with special medical needs.

36.    Shortly thereafter, on April 1, 2013, Ms. Rae was summoned to a formal meeting with the Superintendent "regarding your current working conditions." Ms. Rae was not allowed to have legal counsel at that meeting.

37.    She thought the meeting might resolve some of her concerns. Instead, however, she was berated and dismissed in front of the union president Joe Curran and Defendant Nelson.  Instead of getting the help that she desperately needed, Nurse Rae received a reprimanding email from Superintendent Donovan after the meeting in an attempt to silence her from speaking out in the future.

38.    Nurse Rae also looked for help and confided in her primary physician at MGH about the isolation she was experiencing at work and how the principal's actions caused her anxiety and intimidated her when she dared to ask for assistance at work. Nurse Rae's doctor knew she was not sleeping well and having bouts of depression. Dr. Dickenson at MGH recommended she go and see an MGH social worker to begin addressing her internal struggles with workplace hostility. He wrote a letter to administration about his concerns that Nurse Rae was working in a

hostile work environment, and explained it was causing problems with her health. He requested her work situation be addressed immediately. However, the administration dismissed the letter and once again, refused to help.

### NEW NURSE LEADER DOES NOT BRING ABOUT REFORM

39.    In October 2014, a new nurse leader was hired who promised to work with Ms. Rae to address the problems she had been having. Ms. Rae was hopeful that with the new leader, the hostile environment would change. The former nurse leader had stepped down when her disciplinary action had been determined to be unfounded.

40.    Ms. Rae and the new nurse leader met with Superintendent Donovan and explained the deficiencies, the needs of the students, and a request for a formal diabetes policy. However, the superintendent refused to offer any help or to remedy the situation.

41.    Meanwhile, Defendant Nelson continued his hostility towards both Ms. Rae and special needs students under her care. Ms. Rae reached out to the school counselors but they were afraid to help. Once again, she endured the wrath of the Defendant for having criticized his actions and his harassment towards her increased.

### PURPOSEFUL MISCHARACTERIZATION OF FIELD TRIPS;
### MS. RAE FILES COMPLAINT

42.    Later in the year, Defendant Nelson purposefully mischaracterized two school-sponsored field trips as not being sponsored by the school so he could deny medically disabled students access to these field trips.  In an effort to save the district money, he refused to offer additional substitute nurses.

43.    Defendant Nelson was overheard by a fellow teacher laughing about how he had "pulled a fast one" and did not have to provide a "useless nurse" (i.e. Ms. Rae) on the field trip even though federal and state law required a nurse to be present on such trips.

44.     That teacher had heard Defendant Nelson tell harmful jokes about Ms. Rae, insinuating she was excessively vigilant and rigid about student safety. This employee was also asked to turn a blind eye to the fact that a diabetic student was going on the trip and to keep that information from Ms. Rae.

45.     Ms. Rae was outraged and in response, filed a formal complaint with her nurse leader and union which she called the "Kennedy Incident Report."  The union grievance officer had encouraged her to chronicle all the acts of retaliation and abuse by Defendant Nelson. See Exhibit A.  In the complaint, Ms. Rae identified how Defendant Nelson was abusing his power and overriding her medical decisions to the detriment of the students.

46.     In that document, Ms. Rae also outlined an incident where Defendant Nelson illegally supervised a child while the child self-administered insulin against doctor's orders.  This  put Ms. Rae's nursing license at risk, because this child suffered from autism andanxiety, and the doctor had ordered close supervision of his medical needs by a registered nurse.

47.     Ms. Rae's concerns were never acted upon. Instead, the bullying and hostile work environment continued unabated, and her complaint only managed to fuel the fire against her.

## MS. RAE REACHES OUT TO UNION FOR HELP

48.     The union advised Ms. Rae to continue to put all of her communications with Defendant Nelson in writing in order to reduce the risk of confrontations and physical contact.

49.     Nurse Rae continued to call and write emails to the WPS Teachers Union grievance officer to no avail. Union grievance officer Brian Gilbertie sat in Nurse Rae's office one day while she was panic stricken as she told him how the principal just got through yelling at her in his office, for no good reason. Defendant Nelson's yelling was so loud that the counselors down the hall heard him screaming.

50.    At this time Brian Gilbertie told her that he used to work under Principal Nelson and that "he will make your life miserable if he hates you." The union grievance officer recommended to Nurse Rae that she should "take the first transfer out of this school when it comes."

51.    Defendant Nelson asked the new head nurse to keep tabs on Ms. Rae to try to find issues he could use against her, to further intimidate her and to impede her efforts to transfer. He sent the head nurse into Ms. Rae's office several times with made-up reasons in an effort to rattle her. The union grievance officer told Nurse Rae that he was aware that Principal Nelson was engaging in behavior that was designed to rattle her and to make her quit and finally admitted that the union was powerless to help. Defendant Nelson had received too much support from the Superintendent.

## MS. RAE ASKS FOR TRANSFER AND IS DENIED

52.    On October 5, 2015, Ms. Rae sent letter to the union titled "No More Bullying I Want a Transfer." See Exhibit B. She outlined the hostile work environment and requested a transfer.

53.    She was not given the transfer. Instead, the former nurse leader persuaded the administration to hire her sister for the position instead. This nurse had far less experience than Ms. Rae.

54.    Ms. Rae became even more distraught and began having anxiety episodes throughout the workday. The union continued to advise her to keep a journal recording Defendant Nelson's behavior.

55.    In the summer of 2016, Ms. Rae applied for an open Nurse Leader position in the district. That request was denied, despite her qualifications and seniority.

56.    After this denial, Defendant Nelson's behavior escalated. He became even more quick to anger and would get red in the face as he talked to Ms. Rae about her nursing decisions. He

started openly berating Nurse Rae and demeaning her in front of other staff. He began to enter her office unannounced where he would proceed to stand over her and yell, his face turning red from the emotion.

57.     His actions were meant to intimidate Nurse Rae, and he succeeded in intimidating her. Nurse Rae became frightened and began to recoil when he would chastise her needlessly and continually undermined her authority.

## NELSON TAKES UNJUSTIFIED DISCIPLINARY ACTION AGAINST MS. RAE FOR LETTER TO PARENTS

58.     Defendant Nelson continued his pattern of retaliation against Ms. Rae in 2016. One month after praising her for her performance related to informing parents about vaccinations he then disciplined and suspended her for a day for an action involving parent communications about vaccinations.

59.     On June 24, 2016, Ms. Rae received a favorable evaluation from Defendant Nelson that praised her for putting "new strategies in place for having immunization forms returned". He acknowledged her for her efforts and praised her for doing a nice job "keeping parents updated and getting information from parents." See Exhibit C. Despite these praises, he did not conduct the one-on-one evaluation meeting on June 1, 2016, and refused to assist her when she asked for his help to retrieve the additional state mandated immunization compliance forms from the parents of the 54 students who remained non-compliant.

60.     In the comment section to the evaluation, Ms. Rae wrote on June 29, 2016, that she regretted that he never met with her. She also wrote that she was planning to send an all-call letter to the non-compliant parents and had come to school to print out labels for the sending of the letter. *Id*. Ms. Rae discussed with Defendant Nelson that parents should be informed about

their obligation to comply with the vaccination requirements. However, Defendant Nelson

refused to send an email to all parents explaining the obligation, even though he had done so in

2014 and 2015.

61.     Because he had abdicated his responsibility, Ms. Rae drafted the all-call letter to the 54

parents using the same form/script that Mr. Nelson had used in 2014 and 2015.

62.     Ms. Rae was at the same time concerned that the district had still not implemented a

formal diabetes policy, and filed an official complaint with Defendant Crowley, Building

Manager Joseph Elia, and Nurse Leader Danzio on July 26, 2016. See Exhibit D.

63.     Late summer, while still on vacation, Defendant Nelson sent Ms. Rae an email

summoning her to report to his office on the first day of school, September 8, 2016. See Exhibit

E.

64.     It is noteworthy that this disciplinary hearing was scheduled only one month after Ms.

Rae had filed her complaint entitled "Kennedy Incident Report." See Exhibit A *supra*.

65.     After Ms. Rae received the email summonsing her to a disciplinary hearing, she reached

out to the union to see when the union would be available. Ms. Rae had several email exchanges

between the union because no union representatives were available the first week of school.

66.     On September 2, 2016, 6 days before the disciplinary hearing, Ms. Rae received an email

from Brian Gilbertie, WTA grievance officer, responding to her request to file a grievance level

1 for Defendant Nelson's fictional disciplinary meeting as retaliation. See Exhibit F.

67.     The same day, Ms. Rae replied in an email to all union representatives why a grievance

was imperative at this time, citing that Defendant Nelson was trying to force her to quit and was

retaliating against her for whistleblowing with her July 26, 2016 complaint. *Id.*

68.     On October 7, 2016, Defendant Nelson formally disciplined Ms. Rae for sending out the letter.  He suspended Ms. Rae for a day without pay. This was only two months after Ms. Rae had filed her most recent complaint.

69.     He claimed Ms. Rae was being disciplined because Nurse Rae had sent a letter to parents about immunizations with his name without permission. However, his approval was given as it was the same form he and she had used in 2014 and 2015 and Nurse Rae had just been praised in her evaluation for her efforts regarding immunizations. See Exhibit G.

70.     Mr. Nelson also cited her for not attending the first meeting he had scheduled even though he knew from an email that she had asked for the meeting to be postponed so that she could obtain union representation.

71.     It is telling that later that month, Defendant Nelson sent, at the request of nurse leader Mary Heater, an almost identical letter to parents as the one written by Ms. Rae for the same purpose as Ms. Rae's letter.

72.     This fact confirms that the letter Ms. Rae had sent was not improper but instead was used as a pretext to unfairly discipline her in retaliation for her complaint.  However, Defendant Nelson did not withdraw the suspension from Ms. Rae's personnel file and continued to hold a grudge against Ms. Rae.

## MS. RAE REACHES OUT TO UNION AGAIN WHO CONFIRMS THAT NELSON'S DISCIPLINARY ACTION WAS WRONG

73.     On the day of her suspension, October 12, 2016, Ms. Rae reached out to the current nurse leader and the new nurse leader Mary Heater to discuss in detail Defendant Nelson's abusive behavior and his continued obstruction and intimidation to performing her job and her demand for student safety. See Exhibit H.

74.     Following the suspension, Nurse Rae continued to become increasingly afraid as Principal Nelson's behavior became more and more abusive. She started experiencing severe emotional distress and had trouble sleeping.

75.     The district did not have a human resources department and failed to follow its policies about workplace bullying, so Ms. Rae had no place to lodge an official complaint. She again reached out to the union for help.

76.     Union leaders continued to offer emotional support and reminded her to "stand clear of Carl Nelson when he gets mad or he doesn't like you."

77.     On October 20-26, 2016, Ms. Rae officially reached out to grievance officer Brian Gilbertie and the Massachusetts Teacher's Association to complain about the unfair discipline. In an email sent to Maryelen Calderwood of the MTA, Mr. Gilbertie stated, "Both Barbara Locke and myself believe this was not a fair decision (suspension)." See Exhibit I.

78.     The MTA confirmed that Defendant Nelson had violated M.G.L. c. 42D by not allowing Ms. Rae to have legal counsel before the discipline was implemented. See Exhibit J.

79.     Ms. Rae sent Principal Nelson a formal rebuttal letter on October 29, 2016, based on the union's findings, but her rebuttal was ignored. See Exhibit K. The union president also drafted an email stating that the union would not stand for a hostile work environment. *Id.* This letter was ignored.

## MS. RAE TURNS TO SCHOOL COMMITTEE FOR HELP

80.     Things continued to get worse and the hostility toward Ms. Rae increased. On March 29, 2017, union leaders and Ms. Rae requested a meeting with school committee member Joe Demers and newly appointed Superintendent Matthew Crowley to discuss the wrongful disciplinary action and the ongoing retaliation.

81.    The three met on April 4, 2017, along with union representatives Brian Gilbertie and Barbara Locke. Ms. Rae provided her 2016 formal complaint, once again pointing out the district's failure to fund nursing services for diabetic students and that the number of diabetic children in the district was increasing. She told them that these students were being denied a free and appropriate public education (FAPE). Defendant Crowley, who was then Assistant Superintendent of 504 Plans, objected that the issues Ms. Rae was raising had nothing to do with him, and left the meeting. The administrators refused to acknowledge and investigate the state and federal law violations Ms. Rae identified.

### MS. RAE BERATED FOR HER ADVOCACY EFFORTS ON STUDENTS' BEHALF

82.    Also in April of 2017, Ms. Rae became professionally involved in assisting and advocating for a student with chronic health issues, which often prevented him from attending school. During her advocacy, this child's mother conveyed how her son was bullied in elementary school and requested her assistance to help prevent that in the future. Her child's medical condition caused the child to soil his clothes and he had been shamed to a point where he didn't want to go to school.

83.    Ms. Rae participated in drafting this child's IEP and advocated that his bullying and his chronic illness be included in the IEP plan. During that meeting, Defendant Nelson belittled Ms. Rae in front of the special education staff for requesting these protections to be incorporated into his IEP plan.

84.    Ms. Rae continued to help the student, all the while being verbally dismissed and berated by Defendant Nelson when the topic of ongoing bullying was discussed with Nelson and the school psychologist.

85.     On June 7, 2018, Ms. Rae convened a meeting with Defendant Nelson and others to

discuss what she thought needed to be done to help him with his medical and bullying situation.

Once again, Defendant Nelson yelled at and berated her for her advocacy while her peers looked

unsure and feared that agreeing with Ms. Rae would escalate the situation. See Exhibit L

### MS. RAE FILES GRIEVANCE WITH THE UNION

86.     On June 2, 2017, Ms. Rae filed a 16-page grievance document with the union outlining

her concerns and how she had been treated. Nothing became of the grievance – the union

grievance officer Brian Gilbertie wanted to handle it a different way, warning Ms. Rae that she

would have two targets on her back if she continued to pursue the grievance.

87.     The emotional distress suffered by Ms. Rae continued to increase. Two days later, on

June 4, 2017, Defendant Nelson belittled and berated Ms. Rae in front of a student.

88.     Later that month, Ms. Rae's husband was diagnosed with stage 4 fatty liver disease.

Ms. Rae needed to focus her attention on her husband's care and continued to suffer in silence

while she took her husband to medical appointments.

### MS. RAE RETURNS TO SCHOOL COMMITTEE FOR HELP

89.     On September 8, 2018, Ms. Rae sent two letters to Woburn School Committee member

Joe Demers, explaining all she had been through, describing the hostile work environment and

the effect it was having on her own health. See Exhibit M.

90.     For several months, Mr. Demers failed to take action, while promising that he would

assist in remedying the harassment. However, finally, on December 28, 2018, Mr. Demers sent

an email to Ms. Rae informing her that the district had just hired a human resources director and

that Ms. Rae should lodge her complaint with the newly created HR office. He also said he was

"committed to making sure we A) develop and institute a diabetes management (covering all

your valid safety concerns)...and B) addressing the harassment you and Dani (another employee) have experienced at the Kennedy Middle School." See Exhibit N.

91.     Ms. Rae was not convinced that the HR office could help her, so in July 2019, she and her husband hired a lawyer to represent her. The lawyer sent a letter to the district. See Exhibit O. The district responded by directing the lawyer to their insurance carrier, and negotiations occurred between the insurance carrier and the lawyer in an effort to avoid litigation. However, no issues were resolved.

### DEFENDANT NELSON UNDERMINES MS. RAE IN FRONT OF PARENT

92.     On September 17, 2019, a family friend with a car picked up a sick student. The woman became abusive with Nurse Rae, challenging her about the dismissal of the sick child. Ms. Rae had the secretary call in Principal Nelson to defuse the situation.

93.     When Principal Nelson arrived, he ignored Nurse Rae, not even bothering to ask her what was happening. Instead, he met separately with the woman, failing to identify that the woman was not the student's parent, for several minutes.

94.     He then called Nurse Rae into the office, where the woman continued to berate her while Principal Nelson did nothing. Meanwhile, the sick student in the lobby began to require immediate medical attention, which Nurse Rae was unable to provide because Principal Nelson forced her to stay and endure the abuse from the woman and himself.

95.     It was eventually determined that the woman did not have the proper authority to handle medical issues for this student. However, Defendant Nelson did not bother to find this out. Instead, he continued to attack Ms. Rae and ignore her as she tried to explain the situation to him. Berating and embarrassing Ms. Rae was more important to him at the time than trying to get proper medical help for the student.

96.    Ms. Rae was frightened of Defendant Nelson and worried that the student was not receiving adequate care.

### MS. RAE FALSELY ACCUSED OF STEALING A SWEATSHIRT

97.    Weeks later, Defendant Nelson berated Ms. Rae again and falsely accused Ms. Rae of having stolen a sweatshirt that she had given to a student. The sweatshirt in fact belonged to Ms. Rae. However, the incident caused Ms. Rae great distress and upset, especially since it happened in front of a parent sitting at her desk. It was another attempt to embarrass and harass Ms. Rae.

### MS. RAE FILES COMPLAINT WITH HR AND FACES MORE RETALIATION

98.    After several months of false reassurances from union representatives, Ms. Rae turned to the district's newly-created Human Resources department. On or about November 20, 2019, Ms. Rae filed a formal complaint with the HR department. See Exhibit P.

99.    *On the same day* Ms. Rae was scheduled to meet HR Director Judi O'Neill, Defendant Nelson retaliated and intimidated her by summoning her to a disciplinary hearing about an alleged parent complaint. See Exhibit Q.

100.    Ms. Rae arranged for the Nurse Leader to represent her at the hearing and also asked the alleged student involved to be present at the hearing.

101.    Rather than conduct the hearing as scheduled, Defendant Nelson abruptly canceled the hearing, knowing that the basis for the discipline was false and pretextual. However, his actions caused Ms. Rae significant emotional distress and placed her in a constant state of fear that she could face discipline on a whim, with no justification.

### HR AGREES TO INVESTIGATE BUT INVESTIGATION IS A SHAM

102.    The district finally created a Human Resources Department in 2019. The new HR director began investigating Ms. Rae's complaint. Because she had been dealing with this matter

internally for years with no success, Ms. Rae requested that the investigator be an "external individual [that] has no local ties or is out of district, as an unbiased, unassociated, out of district individual whom I can speak freely to, is critical to my privacy."

103.    The HR Director responded that the district was in the process of "securing someone outside of the District to conduct an investigation into the concerns you raised."  See Exhibit R.

104.    However, instead of appointing an outside investigator, the district hired an attorney from Stoneman, Chandler & Miller in Boston, Kate Clark, who was already serving as legal counsel to the district.

105.    Attorney Clark conducted a sham investigation and did not allow Ms. Rae to present evidence or witnesses in her defense. See Exhibit S.

106.    Defendant Crowley was involved in the investigation and his Assistant Superintendent dictated the district's responses to exonerate themselves. There was no written civil rights policy controlling how such complaints should be investigated, so the Superintendent was allowed to conduct it any way he saw fit. He made sure that the information that the investigator had was limited and tailored it in the district's favor. As a result, the investigation predictably found that it could not substantiate Ms. Rae's claims.

107.    Ms. Rae was never given a copy of the report, even though she requested it and her personnel records several times. Instead, she was given a terse letter from Defendant Crowley saying that the complaint could not be substantiated. See Exhibit T.

108.    On March 30, 2020, six days after Defendant Crowley's letter to Ms. Rae saying that the district did not substantiate her complaint (March 24, 2020), the district extended its closure due to the COVID virus until May 4, 2020.

**MS. RAE ASKS UNION TO DISPUTE BIASED INVESTIGATION**

109.    In June of 2020, Ms. Rae and the union president reached out to the HR director requesting a meeting about the shoddy and biased investigation and about the hostile work environment. The HR director responded to their request with the word "LOL," which showed that the district did not take the issue seriously and was demeaning to Ms. Rae. See Exhibit U.

110.    The union did not have success with the HR director, so the union president drafted a letter to Superintendent Crowley expressing the union's concerns with the illegal investigation process.

111.    At this time, the district had implemented a hybrid policy which made it difficult to schedule meetings with the administration. However, Ms. Rae continued to meet with the union.

112.    On January 14, 2021, Ms. Rae's husband passed away.

113.    From March to June of 2021, Ms. Rae and the union worked toward a partial resolution. The union drafted a letter to the Defendant Crowley and Assistant Superintendent which included an agreement that Ms. Rae would no longer have to report to Defendant Nelson nor would Nelson write her performance evaluations. See Exhibit V.

114.    Defendant Crowley refused to sign the agreement but did confirm in writing that Defendant Nelson would no longer conduct Ms. Rae's yearly review because of his blatant hostility towards Ms. Rae. See Exhibit W.

115.    However, in violation of the agreement, Defendant Nelson did participate in the yearly review of Ms. Rae in October of 2021. The computer program used for the review process documented Defendant Nelson as having been responsible for writing the review. See Exhibit X.

## MS. RAE FILES COMPLAINT WITH THE MCAD; SHORTLY THEREAFTER, ANOTHER PRETEXTUAL DISCIPLINARY MEETING IS SCHEDULED

116.    On April 10, 2022, Ms. Rae filed a complaint with the MCAD. The complaint explicitly named Superintendent Crowley and Principal Nelson as the persons responsible for the retaliation and the hostile work environment.

117.    On May 11, 2022, one month after the filing of the MCAD complaint, Defendant Nelson summoned Ms. Rae to a disciplinary hearing. She received the summons on a Thursday afternoon with no explanation for the hearing other than "to discuss a student's t-shirt." See Exhibit Y.

118.    Ms. Rae asked for clarification about the reason for the meeting and if she could see the t-shirt in question. Defendant Nelson refused to answer her. She spent the entire weekend worried and confused and fearful of what fate awaited her on Monday morning.

119.    She had union president Barbara Locke accompany her to the meeting.

120.    The issue involved a student who had needed a replacement t-shirt and went into the nurse's office to retrieve one from the donation pile.

121.    Unbeknownst to Ms. Rae, it turned out that the t-shirt contained a reference to alcohol.

122.    The student put on the t-shirt and five minutes later, another teacher noticed the reference and had the student remove the shirt, which he immediately did. The t-shirt did not cause any disruption to the student environment.

123.    However, because the shirt had been in the nurse's office, Defendant Nelson blamed Ms. Rae for the incident. Ms. Rae had not given the student the t-shirt, and Ms. Rae has seen several students wear shirts with alcohol references on them throughout the school day with no punishment. See Exhibit Z.

124.    The meeting did not result in discipline, but it was disturbing and distressing to Ms. Rae.

125.    The union president believed the meeting was unnecessary and called it retaliatory.   She noted that the Defendant need only have told Ms. Rae what had happened. Instead, the Defendant chose to escalate the issue as he knew that making her fear disciplinary action would be taken against her would further upset Ms. Rae's fragile state of mind.

### UNION REACHES OUT TO SCHOOL COMMITTEE ON MS. RAE's BEHALF

126.    On or about August 1, 2022, Union President Barbara Locke sent a letter to the school committee on Ms. Rae's behalf. See Exhibit AA.

127.    The letter outlined how the district has failed and refused to follow its own anti-bullying and civil rights policies and has done nothing to stop the known harassment and retaliation against employees.

128.    To date, the school committee has not taken any action in response to that letter and has referred the issue to the district's lawyer.

### YET ANOTHER RETALIATORY DISCIPLINARY MEETING

129.    Recently, Defendant Nelson held an unjustified disciplinary hearing which the Union president characterized as "retaliatory."

130.    Specifically, on September 28, 2022, Ms. Rae ran to her car for her inhaler, as it was not in her purse or her office. She thought she had the time to run out to the parking lot and be right back to her duties. She posted a directive on her office door that she would be right back and also placed a sticky note on her desk stating that she would be right back.

131.    Learning she did not have her rescue inhaler in her car, concern set in, and she stayed in the car to think of her medical options to relieve her breathing. She made a call to obtain an inhaler to no avail. She remained inside her car, calmed down, and decided to go back in the building so she would not be missed.

132.    As she tried to re-enter the building from the side teacher parking lot, her door ID card would not work, and she was locked out of the building. She tried several doors and realizing that she was outside for some time, she used her cell phone to call the front desk secretary to tell of her what has happened.

133.    While this was happening, Mr. Nelson paged Ms. Rae seven times using the school's internal public address system, which Ms. Rae could not hear because she was locked outside the building.

134.    The situation presented in the front office was clearly not an emergency, as Mr. Nelson knew, but only a student waiting for a simple check of his blood sugar before gym class. The situation was easily handled when one of the administrators helped the student check his blood and he went to gym class.

135.    Ms. Rae was finally able to enter the building, and she was met with a very angry response from Mr. Nelson asking her why she did not respond to the page. She explained what had happened, and that she had called the office to say she was locked out. However, Mr. Nelson, despite knowing this, still berated her, deliberately embarrassing and shaming her in front of her colleagues at the front desk.

136.    Mr. Nelson created a false emergency and made her feel as though she were responsible for disrupting more than 30 classrooms in session, Mr. Nelson could have asked the secretary to contact her by calling her cell or texting her, but instead chose the most embarrassing and public way by calling her name seven times for more than 10 minutes on the schools' announcement system. This was a gross exaggeration of the situation which was totally unnecessary, and which was clearly designed to humiliate Ms. Rae.

137.    Mr. Nelson's false sense of urgency caused panic among Ms. Rae's closest coworkers, wrongly thinking that something catastrophic had happened. The rest of the day, fellow employees approached Ms. Rae and asked her what had happened. She was forced to reveal to her coworkers that she had had a medical problem and was at her car trying to get her inhaler.

138.    One hour later, Defendant Nelson summoned Ms. Rae to a disciplinary hearing and advised her to have union representation.

139.    Mr. Nelson held his disciplinary meeting on October 5, 2022. At the meeting were union president Barbara Locke, union representative Liz Howland, Assistant Principal Kevin Battle. Defendant Nelson also invited the HR director to be present.

140.    Mr. Nelson scolded Ms. Rae in the meeting and kept pushing her for an answer "why" she took so long outside the building, even after she had clearly explained the circumstances.

141.    Throughout the meeting, Defendant Nelson angrily raised his voice and repeatedly interrupted Ms. Rae as she tried to defend herself. At one point in the meeting, he got so frustrated he said, "I don't want to be in a room with you."

142.    Defendant Nelson also read aloud a confidential email Ms. Rae had sent to him explaining what had happened and discussing her medical issue and the severe emotional distress his actions had caused her. This caused Ms. Rae even more humiliation as her medical event and state of mind was shared with her co-workers.

## CONCLUSION

143.    The culmination of these events has led Ms. Rae to experience severe emotional distress. Time and again she was dissuaded from seeking outside help with promises by several employees in the district that they would remedy the situation (i.e. nurse leaders, union, school committee)– all to no avail. She was promised a resolution that never came. Defendants should

not be allowed to escape liability since they engaged in a pattern of delay and intentionally deceived Plaintiff into thinking that the situation would change which they used to discourage and threaten her from going outside the district for help.

144.    The actions of Defendant Nelson and the district against Ms. Rae were intentional. She was branded a trouble maker who was trying to force the district to spend money on students the district would have rather ignored.  Each time she spoke out, she was subject to an adverse action and bullying and harassment.

145.    Defendant Nelson created a hostile work environment which was known and encouraged by Defendant Crowley.

146.    Plaintiff has several witnesses, including former employees and parents of Woburn school students, who are able to testify to having observed the hostile environment created by Defendant Nelson. See Exhibit BB.

147.    To date, the district has not created a diabetes policy, ignoring the request from the Commissioners of Mass DESE and of the Mass Department of Public Health issued in 2011 to Superintendents in Massachusetts. See Exhibit CC. The surrounding communities, including Lexington and Boston, did respond by creating compliant policies.

148.    Ms. Rae continues to work in the hostile environment and faces retaliation while still advocating her students with medical disabilities who are being ignored and often denied eligible services by the administration.

149.    Ms. Rae's attorney reached out to the district's attorney Sasha Gill, Esq. on several occasions to discuss the Defendants' harmful behavior and to secure protection for Ms. Rae from such behavior. Attorney Gill responded by saying, "I receive dozens of emails daily and it is frequently my practice not to respond unless I feel a response is necessary."  The fact that Ms.

Gill does not find it "necessary" to address allegations of ongoing egregious harassment is of deep concern to Plaintiff.

150.    As a result, the harassment and hostile work environment continues. Ms. Rae goes to work each day in a state of fear.

## COUNT ONE
## RETALIATORY HARASSMENT UNDER THE REHABILITATION ACT AGAINST WOBURN PUBLIC SCHOOLS AND CITY OF WOBURN

150.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

151.    Plaintiff engaged in protected conduct under the Rehabilitation Act, by, among other things, attempting to protect the rights of disabled students and advocating for their rights. Specifically, she filed internal complaints to her supervisors and the school committee, she made reports to the Mass Department of Public Health, she filed grievances with the union, and filed a complaint with the MCAD, all as discussed in greater detail above.

152.    These actions, taken together and separately, created a severe and pervasive hostile work environment.

153.    Defendants retaliated against Plaintiff after she attempted to protect the rights of her students.

154.    Defendants have taken adverse actions against the Plaintiff which include, but are not limited to: 1) subjecting her to unfounded discipline and suspension of pay; 2) denying her a transfer; and 3) creating and allowing a hostile work environment.

155.    Plaintiff has suffered damages as a direct and proximate result of Defendants' actions.

**COUNT TWO**
**RETALIATORY HARASSMENT UNDER THE ADA 42 U.S.C. §12131, et seq.**
**AGAINST WOBURN PUBLIC SCHOOLS AND CITY OF WOBURN**

156.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

157.    Plaintiff engaged in protected conduct under the ADA, by, among other things, attempting to protect the rights of disabled students and advocating for their rights. Specifically, she filed internal complaints to her supervisors and the school committee, she made reports to the Mass Department of Public Health, she filed grievances with the union, and filed a complaint with the MCAD, all as discussed in greater detail above.

158.    Defendants retaliated against Plaintiff after she attempted to protect the rights of her students. Defendants have taken adverse actions against the Plaintiff which include, but are not limited to: 1) subjecting her to unfounded discipline and suspension of pay; 2) denying her a transfer; and 3) creating and allowing a hostile work environment.

159.    These actions, taken together and separately, created a severe and pervasive hostile work environment.

160.    Plaintiff has suffered damages as a direct and proximate result of Defendants' actions.

**COUNT THREE**
**VIOLATION OF M.G.L. c. 151B AGAINST ALL DEFENDANTS**

161.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

162.    Plaintiff has advocated on behalf of students with disabilities.

163.    Plaintiff engaged in protected conduct by, among other things, attempting to protect the rights of disabled students and advocating for their rights. Specifically, she filed internal complaints to her supervisors and the school committee, she made reports to the Mass Department of Public Health, she filed grievances with the union, and filed a complaint with the MCAD, all as discussed in greater detail above.

164.    The unlawful employment practices complained of above were intentional.

165.    The unlawful employment practices complained of above were done with malice or with reckless indifference to the protected rights of Ms. Rae.

166.    Defendants have taken adverse actions against the Plaintiff which include, but are not limited to: 1) improperly and without foundation imposed discipline on the Plaintiff; 2) engaged in continuous harassment of Plaintiff and permitted employees to harass the Plaintiff; 3) contributed to and condoned a hostile and/or abusive workplace; and 4) denied her a transfer.

167.    Plaintiff filed a complaint with the MCAD on April 10, 2022. More than 90 days have passed since the filing of that complaint.

168.    Defendants Nelson and Crowley, as Ms. Rae's supervisors were responsible for creating the hostile work environment.

169.    Defendants Nelson and Crowley were aware of the harassment of Ms. Rae by her co-workers and failed to take action.

170.    Defendants Nelson and Crowley are strictly liable for their harassment of the Plaintiff.

171.    Defendants Woburn Public Schools and the City of Woburn were aware of the harassment of Ms. Rae by her co-workers and failed to take action.

172.    These actions, taken together and separately, created a severe and pervasive hostile work environment.

173.    As a direct and proximate result of Defendants' unlawful harassment, Ms. Rae has suffered damages.

## COUNT FOUR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST MATTHEW CROWLEY AND CARL NELSON

174.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

175.    Defendants' conduct was extreme and outrageous.

176.    Defendants had no right or excuse to engage in such conduct.

177.    Plaintiff did not consent to Defendants' conduct.

178.    Defendants knew or should have known that its conduct was likely to cause Plaintiff severe emotional distress, did cause such severe emotional distress and continues to cause emotional distress.

WHEREFORE, Plaintiff requests the following relief:

1) That the Defendants be enjoined from any acts of retaliation;

2) For compensatory damages;

3) For punitive damages;

4) For treble damages and attorneys' fees pursuant to M.G.L. c. 149 §185; and

5) For any other relief this Honorable Court deems just and meet.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Date:                                             Respectfully submitted,
                                                  Amy Rae,
                                                  By her attorney,


                                                  Laurel J. Francoeur
                                                  BBO 633085
                                                  Francoeur Law Office
                                                  63 Shore Road, Suite 24
                                                  Winchester, MA 01890
                                                  781-222-0557
                                                  laurel@francoeurlaw.com