UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                             |     |                               |
| ------------------------------------------- | --- | ----------------------------- |
|                                             | *   |                               |
| AMY RAE,                                    | *   |                               |
|                                             | *   |                               |
| Plaintiff,                                  | *   |                               |
|                                             | *   |                               |
| v.                                          | *   |                               |
|                                             | *   | Civil Action No. 22-cv-11961-ADB |
| WOBURN PUBLIC SCHOOLS, CITY OF              | *   |                               |
| WOBURN, MATTHEW CROWLEY,                    | *   |                               |
| individually, and CARL NELSON,              | *   |                               |
| individually,                               | *   |                               |
|                                             | *   |                               |
| Defendants.                                 | *   |                               |
|                                             | *   |                               |

## MEMORANDUM & ORDER

BURROUGHS, D.J.

I.      BACKGROUND

        Plaintiff Amy Rae filed suit against Defendants Woburn Public Schools, the City of

Woburn, Superintendent Matthew Crowley, and Principal Carl Nelson (collectively,

"Defendants") bringing counts for retaliatory harassment pursuant to the Rehabilitation Act

(Count I) and under the Americans with Disabilities Act (Count II), violation of Mass. Gen.

Laws ch. 151B (Count III), and intentional infliction of emotional distress (Count IV).  Before

the Court is Defendants' motion to dismiss Plaintiff's complaint.[1]  For the following reasons

Defendants' motion to dismiss, [ECF No. 9], is GRANTED.

---

[1] The Court has already denied Plaintiff's motion for a preliminary injunction, see [ECF Nos. 15, 30], in which Rae sought an order mandating that she be separated from Principal Nelson and that Assistant Principal Kevin Battle act as her supervisor during the pendency of the case.

A.      **Factual Allegations**[2]

The following relevant facts are taken primarily from the complaint, which the Court

assumes to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766

F.3d 87, 90 (1st Cir. 2014).

Plaintiff claims that in the course of her employment as a nurse in the Woburn Public

Schools she "has been the subject of an ongoing campaign of bullying, harassment, intimidation

and retaliation because she advocated for disabled students with special education needs and

because she spoke out about major deficiencies in the special education program."  [ECF No. 1

("Compl.") ¶ 8].  The "main aggressor" was Defendant Nelson, who is the Principal of Kennedy

Middle School, where Plaintiff works.  [Id. ¶¶ 5, 11, 10].

Plaintiff has been with the Woburn Public Schools ("WPS") since 2005.  [Compl. ¶ 11].

In October 2011, the Massachusetts Department of Elementary and Secondary Education

("DESE") Executive Office of Health and Human Services published guidelines for

Massachusetts school districts on managing students with diabetes and "encouraged all schools

to create policies in accordance with the guidelines."  [Id. ¶ 12].  Plaintiff "realized that WPS

lacked a comprehensive policy and began advocating for the implementation of a diabetes

policy."  [Id.].  In response, Nelson insisted that students with disabilities "should not be treated

any differently than other students" or receive accommodations or services related to their

conditions.  [Id.].  Nelson referred to diabetic students as "lazy," and "complained that they used

their medical condition to get out of work."  [Id. ¶ 13].  Additionally, he often "refused to [sic]

students' Section 504 plan, which denied students of needed services."  [Id.].

---

[2] The factual recitation is detailed given the statute of limitations analysis that is required as well
as the intentional infliction of emotional distress claim.  That being said, the Court omits certain
incidents that are not relevant to either of these issues and fall out outside of the limitations
period as determined by the Court.

Plaintiff "began speaking out to members of the administration" about her belief that student needs were not being met.  [Compl. ¶ 14].  Nelson then "started harassing [her] in an attempt to discourage her advocacy."  [Id. ¶ 15].  This harassment included Nelson standing over Plaintiff when she sat at her desk, yelling and demeaning her.  [Id.].  On one occasion, when Plaintiff asked Nelson about annual staff training on EpiPen administration and diabetes management, Nelson had "an explosive reaction" which included him yelling and berating her. [Id. ¶ 16].  Nelson further "tried to intimidate her into discontinuing these necessary trainings." [Id.].  In addition, one special education teacher told Plaintiff that she should "beware" because Nelson "has it sort of . . . in for you."  [Id. ¶ 17].

Also in 2011, when WPS had an "unusually large number of students with diabetes but no official diabetes policy, Plaintiff asked Nurse Leader Marcia Skeffington to hire additional staff.  [Compl. ¶ 18].  No additional staff member was hired and Skeffington "mocked" and "scolded" Plaintiff for "rocking the boat" by asking for more money.  [Id.].  Nelson and Crowley knew about Skeffington's comments.

Skeffington, at some point, told Nelson that Plaintiff had erred in one of the reports she prepared.  Skeffington knew it was "only a scrivener's error" but, because Skeffington reported the error to Nelson, Nelson disciplined Plaintiff for it.  [Compl. ¶ 20].  In December 2011, Plaintiff contacted her union president about a grievance, which the union tried, but failed, to resolve.  [Id. ¶ 21].

Plaintiff alleges that "[t]he bullying continued," which prompted her to contact Superintendent Mark Donovan on March 17, 2012 for help.  [Compl. ¶ 22].  Donovan "sided against the disciplinary action," but nothing changed with the bullying.  [Id.].

In May 2012, the union president drafted a proposed agreement to be signed by Plaintiff and the administration "to put an end to the bullying," but Donovan never signed it.  [Compl. ¶ 23].  In August 2012, Plaintiff hired an attorney who began corresponding with the administration to seek a resolution, but again, nothing changed and Skeffington and Nelson "continued to harass and berate" Plaintiff.  [Id. ¶¶ 24–25].

During November and December 2012, an issue arose involving a diabetic student who refused "to cooperate in self-care."  [Compl. ¶ 26].  Plaintiff tried to help the student but was "thwarted by [] Nelson."  [Id.].  "Instead of allowing [Plaintiff] to handle the medical situation, [] Nelson retaliated against the student by filing a complaint against the student's family with the Department of Child Welfare . . . ."  [Id.].  The child's parents thought Plaintiff had filed the complaint, and responded by "verbally attacking her."  [Id. ¶ 27].  Nelson did not defend Plaintiff or "t[ake] responsibility for his actions."  [Id.].  This caused Plaintiff "extreme distress" because, in her view, she was being used as a "fall guy" for the district's "misdeeds."  [Id.].   At that time, Plaintiff "went back to her attorney but was so distraught and feared further retaliation" that she instructed the attorney not to take further action.  [Id. ¶ 28].   A month or two later, in February 2013, after the bullying got worse, Plaintiff changed her mind and told her attorney to re-engage with the district.  [Id. ¶ 29].

Also in February 2013, a diabetic student was struggling to manage his condition and Nelson made the student "sit in the guidance office unsupervised for four weeks as the district decided about a new placement for the student."  [Compl. ¶ 30].  Plaintiff, who was concerned that the student's rights were being violated, as he had refused tutoring and was therefore not receiving an appropriate education, contacted the chair of the special education department, which angered Nelson, "and his harassment intensified."  [Id.].  Nelson thereafter required the

student to be accompanied by a special education paraprofessional when he went to the nurse's office.  [Id. ¶ 32].  The paraprofessionals resented having to accompany the student and took this frustration out on Plaintiff, yelling at her and complaining that she was causing them to miss their lunch time.  [Id.].  Nelson never stopped the harassment.  [Id.].

At some point between February and April 2013, Plaintiff contacted Ann Sheetz, the Massachusetts Department of Public Health Director of School Health Services to report that Nelson was "refusing to add additional medical related services for diabetic students" who could not control their conditions.  [Compl. ¶ 33].  Sheetz told Plaintiff that WPS was "failing in its standard of care for students with advanced medical needs . . . ."  [Id. ¶ 34].  In response, Plaintiff "sent a formal request to the administration for additional nursing hours to be assigned to assist her with the care, education, and medical tasks needed to care for students with special medical needs."  [Id. ¶ 35].

On April 1, 2013, Plaintiff attended a meeting with Nelson and her union president, regarding her "current working conditions" where she was berated and dismissed.  [Compl. ¶ 36].  She was not allowed to have legal counsel present.  [Id.].  Afterwards, Superintendent Donovan reprimanded her via email.  [Id. ¶ 37].

Plaintiff told her primary care physician, Dr. Dickenson, that Nelson's actions were intimidating and causing her anxiety and that she was having bouts of depression and not sleeping well.  [Compl. ¶ 38].  He recommended that she see a social worker to help her address her "internal struggles with workplace hostility."  [Id.].  He also wrote a letter to the administration expressing concern about Plaintiff having health problems as a result of working in a hostile environment.  [Id.].  According to Plaintiff, the administration dismissed the letter. [Id.].

At a later point in either 2014 or early 2015, Nelson "purposefully mischaracterized two school-sponsored field trips as not being sponsored by the school so he could deny medically disabled students access to these field trips." [Compl. ¶ 42]. He was overheard by a fellow teacher saying that he had "pulled a fast one" and did not have to provide a "useless nurse" on the field trip. [Id. ¶ 43]. He also was overheard telling jokes about Plaintiff, "insinuating she was excessively vigilant and rigid about student safety." [Id. ¶ 44]. Upon hearing this, Plaintiff was "outraged" and filed a formal complaint with the nurse leader and the union. [Id. ¶ 45]. In the complaint she alleged that Nelson was "abusing his power and overriding her medical decisions." [Id.]. Her concerns were again not acted on and "the bullying and hostile work environment continued unabated." [Id. ¶ 47].

On October 5, 2015, Plaintiff sent a letter to the union titled "No More Bullying I Want a Transfer," but she was not transferred. [Compl. ¶¶ 52–53]. Thereafter, she became distraught and started to have anxiety episodes during the day. [Id. ¶ 54].

During the summer of 2016, Plaintiff applied for an open Nurse Leader position, but was not selected for the position. [Compl. ¶ 55]. After she was passed over for this job, Nelson's behavior escalated in that he would get angry more quickly. [Id. ¶ 56]. He berated Plaintiff in front of other staff, entered her office unannounced, and stood over her and yelled, all of which frightened Plaintiff. [Id. ¶¶ 56–57].

At a later point in 2016, Plaintiff told Nelson that she planned to send an email to parents who had not satisfied their children's vaccination requirements to inform them of their obligation to have their children vaccinated. [Compl. ¶ 60]. Nelson refused to send the email, but Plaintiff nonetheless took it upon herself to draft and send the email. [Id. ¶ 61]. In response, Nelson sent Plaintiff an email scheduling a meeting for September 8, 2016. [Id. ¶ 63]. Around this same

time, Plaintiff filed a complaint about the continuing lack of an official diabetes policy.  [Id.
¶ 62].   Upon receiving Nelson's email about the meeting, Plaintiff reached out to the union
about filing a grievance regarding the meeting, even before it occurred.  [Id. ¶¶ 65–66].

On October 7, 2016, Plaintiff was formally disciplined for sending the vaccine email to
parents and suspended by Nelson for a day without pay.  [Compl. ¶ 68].  Later in October,
Nelson sent "an almost identical letter" regarding vaccination requirements to parents."  [Id.
¶ 71].

Following the suspension, Plaintiff was "increasingly afraid" of Nelson, and began
experiencing emotional distress and continued having trouble sleeping.  [Compl. ¶ 74].  She
again reached out to the union for help, which offered emotional support.  [Id. ¶ 76].  In or
around the week of October 20, 2016, she contacted union grievance officer, Brian Gilbertie, and
the Massachusetts Teacher's Association ("MTA") to complain about the discipline she had
received.  [Id. ¶ 77].  In an email from Gilbertie to the MTA, he stated that he believed that
Plaintiff's suspension was unfair.  [Id.].  The MTA confirmed that Nelson had violated Mass.
Gen. Laws ch. 42D by not allowing Plaintiff to have legal counsel before the decision was
implemented.  [Id. ¶ 78].  Plaintiff then sent Nelson a "formal rebuttal letter" on October 29,
2016, which was ignored.  [Id. ¶ 79].

The situation continued to deteriorate, and on March 29, 2017, union leaders and Plaintiff
requested a meeting with school committee member Joe Demers and newly appointed
Superintendent Matthew Crowley to discuss the situation.  [Compl. ¶ 80].  During the meeting,
held on April 4, 2017, Plaintiff "provided her 2016 formal complaint," noted the district's
ongoing "failure to fund nursing services for diabetic students" and voiced her opinion that the

students were being denied a free and appropriate public education ("FAPE").  [Id. ¶ 81].
Nothing came of the meeting.  [Id.].

In April 2017, Nelson "belittled" her during an Individualized Education Plan ("IEP")
meeting in front of a special education staff member after she requested protections and helped
draft the IEP for a student with chronic health issues.  [Compl. ¶ 83].

On June 2, 2017, Plaintiff filed a grievance with the union regarding her concerns about
how she had been treated, but nothing came of it.  [Compl. ¶ 86].  On June 4, 2017, Nelson again
"belittled" Plaintiff, this time in front of a student.  [Id. ¶ 87].

Over a year later, on September 8, 2018, Plaintiff sent two letters to school committee
member Demers describing all she had been through, but Demers failed to take action for several
months until, on December 28, 2018, he emailed Plaintiff that the district had hired a human
resources director and that Plaintiff could file a complaint with them.  [Compl. ¶¶ 89–90].
Plaintiff "was not convinced that the HR office could help her" and retained another lawyer to
represent her in July 2019.  [Id. ¶ 91].

On September 17, 2019, after a woman picking up a student "became abusive" with
Plaintiff, she called Nelson "to defuse the situation," [Compl. ¶ 92], but he allowed the woman to
continue to "berate" Plaintiff and also verbally "attack[ed]" her himself.  [Id. ¶¶ 94–95].

Weeks later, Nelson again berated Plaintiff and "falsely accused [her] of having stolen a
sweatshirt that she had given to a student."  [Compl. ¶ 97].  The incident caused Plaintiff "great
distress . . . ."  [Id.].

In November 2019,[3] Plaintiff filed a formal complaint with the HR department.  [Compl. ¶ 98].  On the same day that Plaintiff was scheduled to meet with the HR Director, Nelson summoned her to a disciplinary hearing about an unrelated parent complaint.  [Id. ¶ 99].  Nelson ultimately canceled the hearing but the experience nonetheless caused Plaintiff distress and "placed her in a constant state of fear that she could face discipline on a whim, with no justification."  [Id. ¶ 101].

With regard to the HR complaint, Plaintiff requested that the investigator be someone with "no local ties" so that they would be "unbiased" and someone to whom she could "speak freely . . . ."  [Compl. ¶ 102].  The district said that were looking for an external investigator, but instead hired Kate Clark, an attorney from a Boston law firm, who was already serving as legal counsel to the district.  [Id. ¶ 104].  Plaintiff alleges that Clark conducted a "sham investigation" and "did not allow Plaintiff to present evidence or witnesses in her defense."  [Id. ¶ 105].  The investigation determined that Plaintiff's claims could not be substantiated.  [Id. ¶ 106].  Plaintiff requested a copy of the report, but was never provided it.  [Id. ¶ 107].

In June 2020,[4] after the school district closed in March because of Covid, Plaintiff and the union president reached out to the HR director to request a meeting regarding the investigation into Plaintiff's complaint.  [Compl. ¶ 109].  The meeting with the HR director did not resolve the situation, so the union president drafted a letter to Superintendent Crowley expressing the union's concerns about the investigation.  [Id. ¶ 110].

---

[3] For reasons set forth more fully below, the Court finds that for the retaliation, rehabilitation and intentional infliction of emotional distress claims, only events that occurred on or after November 17, 2019 are within the limitations period.

[4] The Court further notes, for reasons set forth below, only events that occurred on or after June 14, 2021 are within the limitations period for the Chapter 151B claim.

Between March and June 2021, Plaintiff and the union "worked toward a partial resolution," with the union drafting a letter to Crowley and the assistant superintendent that included an agreement that Plaintiff would no longer have to report to Nelson and that Assistant Principal Kevin Battle would be her "primary evaluator[.]"  [Compl. ¶ 113; ECF No. 1-1 at 80]. Crowley refused to sign the agreement, but said that he "agree[d] with [her] primary evaluator being switched to Mr. Kevin Battle[,]" but that he "c[ould not] agree to the other terms that you listed in your draft agreement."  [ECF No. 1-1 at 80].  The computer program used for the review process documented that Nelson participated in Plaintiff's yearly review.  [Compl. ¶ 115].

Approximately a year later, on April 10, 2022, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), which named Crowley and Nelson as responsible for retaliation and a hostile work environment.  [Compl. ¶ 116].

On May 11, 2022, Nelson asked Plaintiff to attend a meeting with him on May 16, 2022 "to discuss a student's t-shirt."  [Compl ¶ 117; ECF No. 1-1 at 84].  Plaintiff had union president Barbara Locke accompany her to the meeting.  [Compl. ¶ 119].  The meeting concerned a student who "needed a replacement t-shirt" and had taken one from the donation pile in the nurse's office that bore a reference to alcohol.  [Id. ¶¶ 120–21].  Nelson blamed Plaintiff for the incident, but no discipline resulted.  [Id. ¶¶ 123–24].

On September 28, 2022, Plaintiff went to her car to search for her inhaler and left a note on her door stating she would be right back.  [Compl. ¶ 130].  She could not find the inhaler, and stayed in the car, trying to figure out how to get one.  [Id. ¶ 131].  When she tried to re-enter the school, her ID card would not work, leaving her effectively locked out, which required her to use her cell phone to call the front desk to regain entry.  [Id. ¶ 132].  While she was out of the building, Nelson "paged Plaintiff seven times over the school's internal public address system,"

which Plaintiff did not hear because she was outside.  [Id. ¶ 133].  When Plaintiff got back

inside, Nelson met her with a "very angry response" and asked her why she did not respond to

the pages.  [Id. ¶ 135].  Although she explained the situation, he nonetheless berated her in front

of her colleagues at the front desk.  [Id.].  Because Nelson had paged her so many times,

throughout the day, other employees asked her what had happened, which caused Plaintiff to feel

that she had to tell them that she had a medical problem and was trying to get her inhaler.  [Id. ¶

137].

Nelson later "summoned [Plaintiff] to a disciplinary hearing and advised her to have

union representation."  [Compl. ¶ 138].  The hearing took place on October 5, 2022, and was

attended, among others, union representatives, Assistant Principal Kevin Battle, Plaintiff, and

Nelson.  [Id. ¶ 139].  Nelson scolded Plaintiff and asked her why she took so long outside the

building.  [Id. ¶ 140].  During the meeting, Nelson "angrily raised his voice," "repeatedly

interrupted Plaintiff," and, at one point, said "I don't want to be in a room with you."  [Id. ¶ 141].

Nelson also read aloud a "confidential email" Plaintiff had sent to him explaining what had

happened, her medical issue, "and the severe emotional distress his actions had caused her."  [Id.

¶ 142].

### B.    Procedural Background

Plaintiff filed her complaint on November 17, 2022.  [Compl.].  Defendants moved to

dismiss her complaint on December 12, 2022, [ECF No. 9], and Plaintiff filed an opposition on

December 23, 2022, [ECF No. 14].

## II.      MOTION TO DISMISS

### A.      Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure, the Court must accept as true all well-pled facts, analyze those
facts in the light most favorable to the plaintiffs, and draw all reasonable inferences from those
facts in favor of the plaintiffs.  U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377,
383 (1st Cir. 2011).  Additionally, "a court may not look beyond the facts alleged in the
complaint, documents incorporated by reference therein and facts susceptible to judicial notice."
MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v.
City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

A complaint "must provide 'a short and plain statement of the claim showing that the
pleader is entitled to relief[,]'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st
Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and must "set forth factual allegations, either direct
or inferential, respecting each material element necessary to sustain recovery under some
actionable legal theory[,]" Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).
Although detailed factual allegations are not required, a complaint must set forth "more than
labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and
"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory
statements, do not suffice[,]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint
"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

### B.      Analysis

In her complaint, Plaintiff brings the following claims: (1) retaliatory harassment pursuant to The Rehabilitation Act, 29 U.S.C. § 702 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. 126 § 12101 *et seq.* against Woburn Public Schools and the City of Woburn (Counts I and II); (2) violation of Mass. Gen. Laws ch. 151B against all Defendants (Count III); and (3) intentional infliction of emotional distress against Crowley and Nelson (Count IV). Defendants respond, in part, that Plaintiff's complaint cannot survive a 12(b)(6) motion because the majority of her claims are untimely, and, she has failed to adequately allege claims for retaliation, violation of Chapter 151B, or intentional infliction of emotional distress.

Before proceeding with its analysis, the Court must first determine what allegations are timely and thus properly considered when assessing her claims.

### 1.      Claims for Retaliation Under the ADA and Rehabilitation Act

The Court begins with Plaintiff's claim brought pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act.  Both claims are subject to a three-year statute of limitations.  Cunningham v. Potter, 2009 WL 10694441, at *2 (D. Mass. June 18, 2009) (citing Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 118 (1st Cir. 2003)) (further citation omitted); Crevier v. Town of Spencer, 600 F. Supp. 2d 242, 258 (D. Mass. 2008) (citing 42 U.S.C. § 2000e(e) and Mass. Gen. Laws ch. 151B, §9).  Plaintiff's complaint was filed on November 17, 2022, so events prior to November 17, 2019 would be time barred pursuant to the statute of limitations.  Plaintiff, however, argues that all the allegations in her complaint are timely through application of the continuing violation theory.

The continuing violation "doctrine permits a person to seek damages for alleged discrimination occurring outside the usual statute of limitations period if the alleged events are

part of an ongoing pattern of discrimination, and there is a discrete violation within the statute of limitations period to anchor the earlier claims." Diaz v. Jiten Hotel Mgmt., Inc., 671 F.3d 78, 85 (1st Cir. 2012) (quoting Pelletier v. Town of Somerset, 939 N.E.2d 717, 731 (2010)). To recover for discriminatory acts that occurred outside of the statute of limitations period, a plaintiff must demonstrate that: (1) at least one discriminatory act occurred within the statute of limitations period; "(2) the alleged timely act or acts had a substantial relationship to the alleged untimely act or acts; and (3) any discriminatory acts that occurred outside of the statute of limitations period did not trigger [the plaintiff's] awareness and duty to assert her rights." Id. As characterized by the Massachusetts Supreme Judicial Court, the continuing violation doctrine permits a plaintiff to seek damages for violations outside the statute of limitations, "unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in her position would have filed a complaint . . . ." Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 941–42 (Mass. 2001).

For the purposes of this discussion, the Court assumes without deciding that one of the alleged acts that occurred within the statute of limitations period qualifies as discriminatory and is substantially related to alleged acts outside the statute of limitations. This leaves the question whether any of the discriminatory acts that occurred outside of the statute of limitations period should have triggered Plaintiff's awareness and corresponding duty to assert her rights. Here, the Court easily concludes that the continuing violation theory does not save any of Plaintiff's allegations that are outside the statute of limitations. As early as 2011 and 2012, Plaintiff was sufficiently on notice of what she described as bullying and harassing behavior as evidenced by the fact that she filed complaints with her union and hired a lawyer to represent her with respect

to her concerns about the conduct of her supervisors, including Nelson.  Her complaint also describes numerous instances over the next several years that Plaintiff viewed as involving discriminatory or harassing behavior, and admits that these alleged violations prompted her to file complaints with the union and the school committee, and to hire a lawyer to represent her in connection with these complaints.  [Compl. ¶ 21 (Plaintiff filed grievance in December 2011 regarding bullying and harassment); id. ¶ 24 (Plaintiff hired attorney in August 2012 to help seek resolution with district regarding how Plaintiff was treated); id. ¶ 29 (Plaintiff directed her attorney to engage in further negotiations with district in February 2013); id. ¶¶ 44–45 (Plaintiff filed formal complaint with union in late 2014 or early 2015 regarding Nelson's behavior); id. ¶ 77 (Plaintiff contacted union in October 2016 to complain about allegedly unfair discipline); id. ¶ 86 (Plaintiff filed grievance with union on June 2, 2017 regarding Nelson's alleged harassment); id. ¶ 89 (Plaintiff sent letters to school committee member in September 2018 describing alleged harassment)].

Because Plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, she was sufficiently on notice of the need to assert her rights which precludes reliance on the continuing violation theory to make the earlier alleged violations timely.[5]  The Court's analysis is therefore constrained to the events that occurred on or

---

[5] At oral argument on the motion for a preliminary injunction, Plaintiff raised the issue of the relevant statutes of limitations being equitably tolled based on representations by the school district that led her to believe that her concerns were being addressed and thereby discouraged her from pursuing legal action within the limitations periods.  In general, courts have recognized only a few circumstances in which equitable tolling may be warranted.  More specifically, "First Circuit law permits equitable tolling only where the employer has actively misled the employee."  Thomas v. Eastman Kodak Co., 183 F.3d 38, 53 (1st Cir. 1999).  Further, the active deception must concern the discrimination or retaliation that is the subject of the employment claim.  See Mercado v. Ritz-Carlton San Juan Hotel, 410 F.3d 41, 47 (1st Cir. 2005) ("equitable modification is appropriate only where the employer actively misled the employee concerning

after November 17, 2019.  Those events include: (1) Nelson emailing Plaintiff on November 20, 2019 asking her to attend a meeting about a parent complaint, [Compl. ¶¶ 98–99; ECF No. 1-1 at 64]; (2) Nelson participating in Plaintiff's 2021 yearly review, [Compl. ¶¶ 114–15]; (3) Plaintiff being asked to attend a meeting regarding a student's t-shirt, after which she was not subject to

---

the reasons for the discharge") (quoting Earnhardt v. Puerto Rico, 691 F.2d 69, 71 (1st Cir. 1982)).

Here, there is nothing in the record that shows active misrepresentation by the school district or establishes that it deceived her about the basis for an alleged employment practice.  The record reflects a series of long standing, but largely unresolved disputes, between Plaintiff and Defendants, but falls well short of establishing that Plaintiff was actively misled.  It further reflects that Plaintiff was not under the illusion that her problems were being remedied.  See e.g., [Compl. ¶ 22 (". . . on March 17, 2012, [Plaintiff] reached out to Superintendent Mark Donovan for help.  He sided against the disciplinary action [against her].  However, bullying continued on many fronts."); id. ¶ 24 ("[Plaintiff] hired an attorney [] in August of 2012, who began corresponding with the district to seek a resolution.  Superintendent Mark Donovan kept putting off the attorney and made promises that were never fulfilled."); id. ¶ 29 ("However, the bullying got worse, so in February of 2013, [Plaintiff]'s lawyer began communicating again with the district.  Unfortunately, after months of correspondence, no solution was reached."); id. ¶¶ 89–91 (after two letters to Woburn School Committee member Joe Demers and weeks of inaction, Mr. Demers sent an email to Plaintiff informing her that the district had just hired a human resources ("HR") director and that Plaintiff should lodge her complaint with the newly appointed director, but Plaintiff "was not convinced that the HR office could help her, so in July 2019, she and her husband hired a lawyer to represent her")].

Finally, there were additional instances where it was made clear to Plaintiff that her issues were not going to be handled to her satisfaction.  See e.g., [Compl. ¶¶ 36–37 (at the April 1, 2013 meeting [with Superintendent Donovan, the union president, and Nelson], Plaintiff was "berated and dismissed in front of the union president Joe Curran and Defendant Nelson.  Instead of getting the help that she desperately needed, [Plaintiff] received a reprimanding email from Superintendent Donovan after the meeting in an attempt to silence her from speaking out in the future"); id. ¶ 40 (in October 2014, Plaintiff and the new nurse leader met with Superintendent Donovan and explained the deficiencies, the needs of the students, and a request for a formal diabetes policy, the superintendent "refused to offer any help or to remedy the situation"); id. ¶ 81 (during a meeting that included Plaintiff, union representatives, a school committee member, and Crowley, Plaintiff shared her 2016 formal complaint and reiterated that the district was failing to fund nursing services for diabetic students, that the number of diabetic children in the district was increasing, and that these students were being denied a free and appropriate public education, and Crowley responded that those issues "had nothing to do with him, and left the meeting" and other administrators "refused to acknowledge and investigate the state and federal law violations [Plaintiff identified]")].

discipline, [id. ¶¶ 117, 123–24]; (4) Nelson paging her over the public announcement system, [id. ¶ 133]; and (5) Plaintiff attending a disciplinary hearing on October 5, 2022 during which Nelson raised his voice, said he did not want to be in a room with Plaintiff, and read aloud an email she had sent him, [id. ¶¶ 141–42].[6]

With these incidents in mind, the Court turns to whether Plaintiff's complaint sets forth allegations sufficient to survive a motion to dismiss pursuant to 12(b)(6).  Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).  To make out a claim for retaliation under Section 504 of the Rehabilitation Act or the ADA, "a plaintiff must show that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012) (citing Carreras v. Sajo, García & Partners, 596 F.3d 25, 35 (1st Cir. 2010); Reinhardt v. Albuquerque Pub. Schs. Bd. of

---

[6] Plaintiff asserts in her papers that the district's decision to select Kate Clark, an attorney who was already representing Woburn Public Schools, to investigate Plaintiff's complaint filed in November 2019 qualifies as an adverse action.  The Court disagrees.  To qualify as an adverse action an employer "must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accoutrement of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service."  Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (internal citation omitted).  Not choosing Plaintiff's preferred investigator does not come close to meeting this definition. Therefore, the Court does not include this alleged "adverse action" when deciding whether Plaintiff has stated a claim under the ADA, Rehabilitation Act, or Chapter 151B.  Even if the Court did consider this decision by Woburn Public Schools, it would have no appreciable effect on the Court's ultimate conclusion.

<u>Educ.</u>, 595 F.3d 1126, 1131 (10th Cir. 2010); <u>Quiles–Quiles v. Henderson</u>, 439 F.3d 1, 8 (1st Cir. 2006)); <u>see also</u> <u>Crevier</u>, 600 F. Supp. 2d at 259.

The general thrust of Plaintiff's claims is that Nelson and the school district retaliated against her for advocating on behalf of students with diabetes and other medical issues. The Court assumes without deciding that advocacy on behalf of such students is protected conduct under both the ADA and the Rehabilitation Act. The next question, then, is whether she was subjected to an adverse action by the defendant. For a retaliatory employment action to be adverse, "the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service." <u>Blackie v. Maine</u>, 75 F.3d 716, 725 (1st Cir. 1996) (internal citation omitted); <u>see also</u> <u>Dixon v. Int'l Bhd. of Police Officers</u>, 504 F.3d 73, 81 (1st Cir. 2007) (stating that in the context of a retaliation claim, an "adverse action" is one "that could well dissuade a reasonable worker from making or supporting a charge of discrimination[]" (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 56 (2006)). There is a strong argument that the allegations in the complaint as detailed above that occurred within the statute of limitations, which largely involved meetings regarding possible discipline, do not constitute adverse actions. Nonetheless, for present purposes, the Court will also assume without deciding that these actions qualify as adverse actions.

The Court turns to the third element, which is whether there is a causal connection between the adverse action and Plaintiff's protected conduct. Here, the Court finds that no such connection exists between Plaintiff's advocacy on behalf of students with diabetes or other

health issues and any of the asserted adverse actions allegedly taken against Plaintiff.  The

disciplinary hearings that Plaintiff was required to attend within the statute of limitations

involved a parent complaint, a t-shirt that a student obtained from the nurse's office, and another

instance where Plaintiff did not respond to a page over the school's public announcement system

because she was outside.  The other alleged adverse event was the fact that Nelson participated

in her 2021 yearly review despite Crowley telling her that her primary evaluator would by Kevin

Battle.  None of these instances are causally related to Plaintiff's advocacy on behalf of students

with disabilities, and therefore Plaintiff has failed to make out a prima facie case of retaliation

under either the ADA or the Rehabilitation Act.

### 2.     Chapter 151B Claim

As with the ADA and Rehabilitation Act claims, the Court begins its analysis of the

Chapter 151B claim with the issue of timeliness before turning to the sufficiency of the

complaint.

Chapter 151B requires employees "to exhaust the administrative process before filing a

civil suit in court and failure to do so normally precludes the filing of that claim."  Posada v.

ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 158 (D. Mass. 2019) (citing Everett v. 357 Corp.,

904 N.E.2d 733, 746–47 (2009)).  The administrative charge must "set forth the particulars" of

the plaintiff's claim.  Pelletier v. Town of Somerset, 939 N.E.2d 717, 726 (Mass. 2010) (quoting

of Mass. Gen. Laws ch. 151B, § 5).  One exception to this exhaustion requirement is the "scope

of the investigation" rule, which provides that

> a claim that is not explicitly stated in the administrative complaint may be
> asserted in the subsequent [civil action] so long as it is based on the acts of
> discrimination that the MCAD investigation could reasonably be expected to
> uncover.

Id. at 727 (internal citation omitted).  "An investigation could reasonably be expected to uncover claims that '1) allege the same type of discrimination and 2) are based on the same type of conduct as the administrative charge.'"  Rucker v. Harvard T.H. Chan Sch. of Public Health, 2021 WL 735809, at *2 (D. Mass. Feb. 25, 2021) (quoting Perch v. City of Quincy, 204 F. Supp. 130, 133 (D. Mass. 2002)).  Here, Plaintiff filed a complaint with the MCAD on April 10, 2022, naming Crowley and Nelson as the persons responsible for retaliating against her and creating a hostile work environment.  [Compl. ¶ 116].  The Court therefore assumes that Plaintiff has sufficiently exhausted her Chapter 151B claim.

Defendants nonetheless argue that many of the allegations Plaintiff relies on in bringing her Chapter 151B claim are untimely.  Under Chapter 151B, "a plaintiff must file an administrative charge with the MCAD . . . within 300 days of the occurrence of the alleged harassing or discriminatory events."  White v. DaVita, Inc., 2013 WL 65409, at *6 (D. Mass. Jan. 3, 2013) (citing Mass. Gen. Laws ch. 151B, § 5).  Plaintiff filed her MCAD complaint on April 10, 2022, therefore, for the events underlying her claims to fall within the statute of limitations, they must have occurred on or after June 14, 2021.

Plaintiff, again, argues that the continuing violation theory operates to save her allegations regarding earlier events.  However, for the same reasons set forth above, the Court disagrees as Plaintiff repeatedly stated, in her complaint, that the actions of Crowley, Nelson, and the school district, generally, caused her to, among other things, hire an attorney and reach out repeatedly to her union to file a variety of grievances and complaints.  Therefore, the Court will use the June 14, 2021 cut-off date in assessing her Chapter 151B claims.

The events that occurred on or after June 14, 2021 include: (1) Nelson participating in Plaintiff's 2021 yearly review, [Compl. ¶¶ 114–15; ECF No. 1-1 at 82]; (2) Plaintiff being

required to attend a meeting to discuss a student's t-shirt that referenced alcohol, which the student had taken from the nurse's office, [Compl. ¶¶ 117, 120–22; ECF No. 1-1 at 84–89]; (3) Nelson paging her seven times over the PA system while she was outside the school building, [Compl. ¶ 133]; and (4) Plaintiff being required to attend a meeting to discuss why she was outside when Nelson was trying to contact her, during which Nelson stated that he did not want to be in a room with her and read aloud an email Plaintiff had sent him that contained information about her medical condition, [id. ¶¶ 139–42].[7]

Having identified the timely allegations, the Court turns to whether Plaintiff's claim can survive a 12(b)(6) motion for failure to state a claim.  Liberally construed, Plaintiff brings claims for retaliation and a hostile work environment pursuant to Chapter 151B.

To state a claim for retaliation under 151B, a plaintiff must plead a prima facie case consisting of three elements: that the plaintiff (1) engaged in protected activity; (2) suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  Psy–Ed Corp. v. Klein, 947 N.E.2d 520, 530 (Mass. 2011). For the same reasons discussed above, the Court finds that Plaintiff cannot state a claim for retaliation because she has not pled a causal connection between the timely allegations of adverse action and any protected activity.

To make out a claim for a hostile work environment the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[7] In other words, the events relevant to evaluating the Chapter 151B claim include nearly the same events relevant to the Retaliation claim, with the exception of Nelson emailing Plaintiff on November 20, 2019 asking her to attend a meeting about a parent complaint, [Compl. ¶¶ 98–99; ECF No. 1-1 at 64], which falls outside the limitations period for the 151B claim and within it for the Retaliation claim.

working environment." <u>Noviello v. City of Boston</u>, 398 F.3d 76, 84 (1st Cir. 2005) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).  For alleged conduct to be actionable, "it must rise to 'some level of substantiality,' such that it materially altered the conditions of [Plaintiff's] employment."  <u>Gudava v. Ne. Hosp. Corp.</u>, 440 F. Supp. 3d 49, 59 (D. Mass. 2020) (quoting <u>Noviello</u>, 398 F.3d at 92).  "The alleged harassment must also be both 'objectively and subjectively offensive,' such that a reasonable person would perceive [the alleged harasser's] conduct as hostile or abusive, and that [Plaintiff] in fact did perceive [the alleged harasser's] conduct to be so."  <u>Id.</u> at 59–60 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998)).  Here, based on the pleadings and at the motion to dismiss stage, the subjective element is not in dispute.

With respect to the objective component, a court must "mull the totality of the circumstances," looking at factors such as frequency and severity, whether the conduct was physically threatening or humiliating, and whether it unreasonably interfered with the performance of the employee.  <u>Noviello</u>, 398 F.3d at 92.

Limiting its inquiry to the timely allegations, the Court is skeptical that the conduct at issue was so severe and pervasive as to create an actionably hostile work environment.  However, even if it did, Plaintiff's claim fails because her allegations regarding these events do not establish a causal link between her protected activity on behalf of disabled students and the claimed harassment.  Rather, a claim related to any alleged harassment that could even be plausibly connected to her advocacy on behalf of students is long since time barred.

Accordingly, Plaintiff has failed to establish a prima facie case of retaliation or a hostile work environment and her Chapter 151B claim is properly dismissed.

### 3.    Intentional Infliction of Emotional Distress

Plaintiff's fourth count alleges intentional infliction of emotional distress as to Crowley and Nelson.  [Compl. ¶¶ 174–78].  As with the previously discussed claims, the Court begins by assessing which, if any, allegations are timely.

The statute of limitations for intentional infliction of emotional distress is three years.  Mass. Gen. Laws ch. 260, § 2A.  The Court therefore looks to allegations of improper or illegal behavior that occurred on or after November 17, 2019, the same timeframe applicable to Plaintiff's ADA and Rehabilitation Act claims.  As such, the Court's analysis is again limited to the same behavior identified in that prior discussion, which include: (1) Nelson emailing Plaintiff on November 20, 2019 asking her to attend a meeting about a parent complaint, [Compl. ¶¶ 98–99; ECF No. 1-1 at 64]; (2) Nelson participating in Plaintiff's 2021 yearly review, [id. ¶¶ 114–15]; (3) Plaintiff being asked to attend a meeting regarding a student's t-shirt, after which she was not subject to discipline, [id. ¶¶ 117, 123–24]; (4) Nelson paging her over the public announcement system, [id. ¶ 133]; and (5) Plaintiff attending a disciplinary hearing on October 5, 2022 during which Nelson raised his voice, said he did not want to be in a room with Plaintiff, and read aloud an email she had sent him, [id. ¶¶ 139, 141–42].

A prima facie case of intentional infliction of emotional distress, requires a plaintiff to show

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

Agis v. Howard Johnson Co., 355 N.E.2d 315, 318–19 (Mass. 1976) (internal quotation marks and citations omitted). "The standard for making a claim of intentional infliction of emotional distress is very high . . . ." Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." Robinson v. Carney, No. 09-11491-RGS, 2010 WL 183760, at *3 (D. Mass. Jan. 20, 2010). "Conduct is extreme and outrageous only if it is 'beyond all bounds of decency and . . . utterly intolerable in a civilized community.'" Eissa v. Ledvance LLC, No. 21-cv-11515, 2022 WL 3446037, at *6 (D. Mass. Aug. 17, 2022) (quoting Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994)).

Here, the Court concludes that the timely allegations do not give rise to a claim for intentional infliction of emotional distress.  The most damning allegation for purposes of this claim is that Nelson stated in a meeting with Plaintiff that he did not want to be in a room with her and read aloud an email that discussed her medical issue.  While certainly objectionable, this behavior cannot be described as beyond all possible bounds of decency.  C.f., Brown v. Nutter, McClennen & Fish, 696 N.E.2d 953, 957 (Mass. App. Ct. 1998) (finding that an employer compelling his legal secretary "by the threat of suicide and the display of tears to forge and then notarize a mortgage note on [the employer's] own home" for personal gain "was beyond all possible bounds of decency and was utterly intolerable in a civilized community").  The Court therefore will GRANT Defendants' motion to dismiss Plaintiff's claim for intentional infliction of emotional distress.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, [ECF No. 9], is <u>GRANTED</u>.


**SO ORDERED.**

May 5, 2023

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
 U.S. DISTRICT JUDGE
